Good morning. I am Ray Niblock. I represent Curtis Pinson along with my colleague Roxanne Blake, and we appreciate having the opportunity to present our case. In the trial court's order granting summary judgment on page 19 of that order, the trial judge wrote, in part, that it could be argued that Mr. Pinson, my client, was forced to access the overhead canopy in some way in order to complete the installation of the sign. The court went on to write that the plaintiffs cannot claim that Mr. Pinson was required to access the canopy in the unsafe manner he selected. The reason why I started off by reading that particular quote is because I think it encapsulates the very reason why this appeal was filed. The plaintiffs believe and have argued that the overarching issue in this case is whether an exception to the open and obvious rule, as articulated in various cases out of Arkansas, should have been addressed by the trial court. And the exception basically revolves around the issue of foreseeability of harm. The court at the trial level, as you know, ruled that there was no duty on the part of the appellees in this case towards Mr. Pinson because he was an independent contractor. However, we believe that the finding of that conclusion of law was dependent on factual conclusions that should have been made by a jury. Two key facts that we believe a jury should have determined rather than the court as a matter of law, first and foremost, revolve around whether it was foreseeable that my client, Mr. Pinson, would have been injured when he encountered the canopy floor, for lack of a better term, that was not weight-bearing. And, of course, the appellees have argued that, due to Mr. Pinson's own alleged negligences, that that was the clear cause. Nonetheless, the foreseeability issue, we believe, is the first thing that a jury should have determined. Say that again, whether it was foreseeable that the floor would give way? Yes, sir. You're saying there's a dispute whether your man knew that? No, sir. I think my client absolutely knew it. In fact, the record is very clear. All right. So what is the foreseeability? Foreseeable by whom, then? Foreseeable by the owner, that would be 45 Development, the appellee, that a person required to be in that canopy would be subject to the lack of a floor. Irrespective of other things, such as the foreseeability that a person accessing that canopy to connect an electrified sign, which was the case here, might, in and of himself, act negligent. Well, how is that duty normally directed? The owner knows that they want to have something done. But the owner may not be familiar with the type of construction or the type of access that needs to be done. So why would the owner know more about it than the skilled worker? That's a very good question, Your Honor, and thank you for asking that. The answer to your question, first of all, is that the owner's duty does not turn on the owner's actual knowledge. And even in the trial court's order, it recognized that the owner knew or at least should have known the condition of the canopy. And that's very clear from the record if you look at the lease agreement between the parties itself that required the owner to, among other things, see that the canopy was code compliant. So perhaps the owners of 45 Development didn't actually know. But the law does not excuse them from should have knowing. With respect to Mr. Pinson's expertise, it is true he was hired as an expert sign electrician. But he was not hired to fix the floor that he had to encounter. He had no choice but to encounter it, whether he came down from the top, as he did, or came up from below, as has been suggested. So would you be more specific about that lease requirement? Where is that found? My cheat sheet, Your Honor. It's good to carry one. It is, it is. The record or the appendix at page 036 is where the lease begins. And specifically in the record, it discusses the canopy at page 44. It discusses the scope of the landlord's work, which includes the canopy at A060. And the mention of code compliance is mentioned at page 62. And so we believe that the lease in and of itself conclusively establishes an argument that because of the contract between the parties, the owner should have known that injury could happen. And that foreseeability is important because that triggers the exception to the rule, the open and obvious rule, as set forth in the Restatement Second of Torts, the Kuykendall case, often cited by us and relied upon by us, and the Vanderveer case, also relied on by us. Go ahead. No, go ahead. Isn't it the case in almost all of these open and obvious situations that the owner knows about the danger? I don't believe so. The whole point of open and obvious is that anybody who's there would see it. So if you're saying the exception applies whenever the danger was reasonably foreseeable to the owner, then what's left of the rule? Well, that's a further good question, which takes us into the next step. Foreseeability is only the gateway to fully exploring why the exception should apply and why the facts that make it apply are disputed in this case. And it has to do with whether or not the injured person is forced to encounter the dangerous situation, in this case the non-weight-bearing floor of the canopy. The fact is that Mr. Pinson could not do his job to electrify that sign and properly install it without one way or another encountering that canopy's floor just by the mere construction of it. And, again, that to me is just a matter of common sense. There was no way around it. Excuse me? Yes, ma'am. Could the floor have been removed? That is definitely an argument that the appellees have made, and the answer is yes, it could have. And I suppose, from my perspective, whether he should have removed the floor and gone up, say, with a scissor lift from below or, as he did, by going down from above, is a matter for a jury to decide whether that was reasonable or not. That's a hotly disputed fact, and, if anything, it would go to his degree of fault, which, again, is a jury issue. And it goes to the heart of causation for that matter, which is also a jury issue. So is it your position that this particular danger was not integral to his job, to his job as an expert sign person? Judge Kelley, exactly. We're arguing that it was not integral. We're arguing perhaps, at best, it was incidental. But he was not there to fix the floor. He was there to hook up a sign. So this kind of situation is not common when someone has to put up a sign or repair a sign, turn on a sign? The record in terms of the commonality of the situation is silent as to that. It is true that electrical workers like Mr. Pinson are trained to work at elevation or use harnesses in, say, a bucket truck. But the record is conspicuously silent about what he's trained to do inside of an enclosed area with no floor that's at elevation. So we believe that it is not the same situation as, say, the Jackson line of cases that's been cited. I call them the Jackson Five. The Jackson cases involve people that were directly injured, for example, electricians getting electrocuted. Classic integral. Mr. Pinson was not a flooring man. He was a sign installer. So we don't believe it was integral. And even if the argument can be made, which I think is another hotly disputed fact, was it integral or was it incidental or not? That needs to be argued before the trial court with respect. How much did he know about what he would be asked to do before he got there? I'm sorry, Your Honor? I'm sorry. How much information did he have about the nature of the job before he arrived at the scene? We believe that coming of the record, the record would disclose that he knew before he entered the canopy that it did not have access, first of all, which is also a key problem, which forced him to go and inspect the canopy from above to see if it's floor. There was a site survey done, so arguably the company he worked for and my client himself probably did know. But, again, the record is – I don't believe it's absolutely clear on that. But he most certainly knew of its open and obvious nature before he entered the canopy because he looked. But, again, that brings us to another issue for a jury to decide, and that's whether he had a choice to encounter that appurtenance either way, by going from below or coming from above. Your Honor, I'm into my rebuttal time. Unless there are any other questions, I would like to yield at this point. Thank you. Thank you very much. Mr. Farthing? May it please the Court? Judges, my name is Joel Farthing. I'm here with my partner, Bob Still. We represent the landowner, 45 Development, in this case. The heart of this case is about independent contracting in Arkansas and in other places in the Eighth Circuit. My client, 45 Development, was a developer. They were an investment company that had a strip mall that they bought many years – that was built many years before they bought it. And they did not – they were not building contractors. They were not experts in building. And, in fact, they didn't even hire Mr. Pinson or his company that employed him. All we did as 45 Development was to lease this space to another party who was involved in the lower case, but is conspicuously not here in the appeal. The lessor of the building is the one that hired Mr. Pinson's employer as an independent contractor to specifically work on this sign, the canopy, which Judge Kelly pointed out during the questioning that they had knowledge of. They sent a survey team out to have a look at it. And as Mr. Niblock admitted, they clearly knew that there was no weight-bearing floor in this particular canopy. In fact, the testimony in the record reflects that Mr. Pinson himself testified that he looked in and saw there was no weight-bearing surface upon which to perform his work inside this canopy. Your Honors have pointed out the obvious danger rule, which is certainly the law of Arkansas. And we have these cases, Kuykendall and Vanderveer, that present Could you adjust the microphone? Oh, I'm sorry. That these two cases in Arkansas, Kuykendall and Vanderveer, that present challenges to the open and obvious danger rule. I would submit to this Court that the open and obvious danger rule is not the rule of law that is at issue here. We have a separate line of cases that deal specifically with independent contractors in Arkansas. The law of Arkansas is that an owner, landowner, property owner, or a hirer of an independent contractor does not owe a duty to that contractor with respect to integral hazards that are contemplated by the work that he is hired to do. And just a very quick example of that is something we might all be able to access mentally, is that consider that a grocery store owner allows ice to accumulate in the parking lot. And consider that a customer shows up and slips on the ice that the grocery store has allowed to accumulate. In that situation, we might all say that the grocery store owner should have cleared that ice out. However, that's not the case we have here. What we have here is a situation where the grocery store owner hires a company to clear the ice, to clear the parking lot and make it safe. Now, the independent contractor that the grocery store hires has brought employees to the scene, and one of them slips and falls on the ice. Now, where you might be able to see that the grocery store could be liable to the customer for the ice, when the grocery store hires an independent contractor to clear out the ice in the parking lot, they're hiring them to confront that hazard. And if the employee of the independent contractor then slips, the grocery store is not liable to that independent contractor. Well, I think your opposing counsel, though, is making another distinction that the expertise he's bringing is to do the sign work. Absolutely. And that he was forced to go to get to the sign. He had to get through a dangerous avenue. So are you saying that those are the same, that that's part of the sign repair? Absolutely, Your Honor. The canopy, and I've included a picture in my brief of the canopy for you guys to look at. The canopy is the sign. It is an enclosed area, and Mr. Pinson testified that he had worked on these sorts of things before. He had, as Mr. Niblock admitted just a few moments ago, he had safety training and harnesses to work at height. He had a bucket truck. And he and his partner both admitted that they had many times worked on signs much higher than this particular sign. What about in this particular type of canopy, this particular type of access to the sign? Your Honor, I don't think that the record reflects whether Mr. Pinson had encountered this very specific type of sign before. But I believe the record does reflect that he testified and his partner testified that they had worked on non-weight-bearing surfaces before and had gotten around it by doing the proper work. Does the record show that he had the equipment there that he could have gone up under the sign? Yes, ma'am. They had access to a bucket lift. They had access. The record shows that they could have called and rented a scissor lift like what Mr. Niblock was talking about a moment ago. In fact, what we contend it would have been the most safe option is to call the owner, which they did not do, and tell the owner we've encountered a situation where we don't have a weight-bearing floor inside the canopy. And Mr. Pinson himself could have, for example, charged 45 Development or, more appropriately, 45 Development's tenant, who was the hirer of this company, to build a floor in there or to bring in another company to build a floor in there. Instead, Mr. Pinson, he was his own supervisor at this site. He didn't have a boss there. He called himself crew leader in testimony. He's the one that made the decision to take the bucket lift up to the roof, create his own access. There was no access door. He pried the metal backing off the top of the canopy and dropped an A-frame ladder down into the admittedly non-weight-bearing floors that he recognized were non-weight-bearing and proceeded to climb down into the canopy on this ladder. Have I addressed the question? Yes. All right. To go on just for a moment about the common sense of this scheme of law, I was reading through the other jurisdictions within the Eighth Circuit, and I found one court that put the policy really well. And I'm not going to just read pages and pages from it, but a couple of sentences that were very well put. The policy of this law that allows owners to hire expert independent contractors to confront hazards such as the sun canopy, it justifies the rule placing the primary responsibility on the contractor for assuring proper precautions will be taken to manage risks arising in the course of the performance of the work. In other words, the contractor himself is the one who is the expert, who can best appreciate the risks that are involved in his own work. The same court went on to say that if liability were not limited in this fashion, inefficiencies would result as employers would be required to develop knowledge and expertise in their own contractors' fields, so as to be prepared to understand even the ordinary risks involved in the work and assure that their own independent contractors take the proper precautions when they undertake their expert work. And that language was well put by the Supreme Court of Iowa, so it's not a scenario where Arkansas has some unique law. In fact, most jurisdictions in the Eighth Circuit have either the very same law or something very similar to it. Your Honors, Judge Holmes, P.K. Holmes was the judge in this case, and we would submit to the court that he did not even need to interpret the law of Arkansas. He merely had to apply it. We have three decades of case law that is uncontroverted on this issue, starting with the Pettygene v. Jackson case that results in, as Mr. Niblatt put it, the Jackson 5 set of cases that we have cited. So Iowa has it right. Arkansas has it right. Arkansas landowners should be able to lease property to tenants who hire experts to come in and do work on that property without risking liability to their employees with respect to the intrinsic parts of the work that they're hired to perform. Well, what in the record shows that the contractor here held himself out as an expert? Your Honor, the testimony was that he has a license in Texas as a master sign electrician. And as I mentioned before, the further testimony stated that he and his partner both testified that they had worked on high signs before, including, I think, billboards where you would have to be way above where this 13-foot drop was in our specific situation. Your Honors, I need to point out that the argument about whether Mr. Pinson was forced to encounter this hazard, his counsel believes that that issue is an issue for the jury to try. But I would point out to the court that this is not an issue of fact for the jury. It goes to duty, and duty is always an issue for the judge to decide, for Judge Holmes to decide in this particular case. Whether something was foreseeable goes to duty. Judge Holmes is the one that decides duty, not the jury. Whether the exception to the obvious danger rule that Mr. Niblack has brought up applies also goes to duty. All of these things are not jury questions. They are questions for the judge. Your Honors, Mr. Niblack stated that he was not hired to fix the floor. However, and we're calling it a floor, but there really was no floor there. In this case, there were aluminum grids that were only meant to hold up the vinyl soffit underneath the sign, basically to keep bugs and things from getting up in there. It wasn't designed- Were they popped out? Yes, ma'am, absolutely. So, Judge Murphy, as you are envisioning, the entirety of the bottom of the canopy could have been popped off, and as Mr. Niblack illustrated, they could have driven a scissor lift underneath it to raise themselves up into the canopy to do their work. And Mr. Pinson, for whatever reason, decided no, we're not going to do that. He decided we're going to go up to the roof, create our own access, and drop a ladder inside to rest on these aluminum grids that were merely designed to hold up vinyl and not human beings. And he admitted that when he arrived and saw it, that he knew that that was not a weight-bearing surface. Your Honors, I believe that I have covered the points that I wanted to make and would ask if you all have any questions for me. Thank you. Thank you. Oh, I thought of one more thing. About the lease argument. First of all, the lease contract that Mr. Niblack was talking about was not between, the contract itself was not between 45 Development and Mr. Pinson. It was between 45 Development and the tenant who hired the company that employed Mr. Pinson. And I wanted to just read you the sentence that I believe Mr. Niblack was talking about. It says, this is from the record, page 62, construction by landlord, which is 45 Development, and landlord subcontractors shall comply with existing municipal, state, and federal codes. So if 45 Development decided to pick up a hammer and do its own construction, it would have to comply with codes, just as everyone has to comply with codes. And if 45 Development hired a subcontractor, then landlord's subcontractor would be required to adhere to codes. But that's not the situation we have here. We have the tenant's subcontractor that the landlord did not even know about, who was on site installing this sign. So this contract has essentially no bearing on the relationship, or the lack of relationship, between my client, the owner of 45 Development, and Mr. Pinson. And unless there are questions about that particular issue, then I am truly done at this point. Thank you all. Okay, Mr. Niblack, you've got some reserved time. Yes, ma'am, just a little bit.  Thank you again. I'll try to address some of the things that I need to get done here. First of all, it is true. Everyone in this case must adhere to safety codes, including 45 Development, the appellee. It is also true that the contract was not between my client or his company that hired him and 45 Development, but that is absolutely immaterial. The contract exists to prove the source of knowledge of foreseeability of harm. This contract clearly, clearly places responsibility on the owner, and it contemplates the design and the layout of the canopy. To rule the way the appellees have argued regarding the Jackson line of cases and what Iowa has done or other jurisdictions have done ignores Arkansas law, based on the Restatement Second of 1965, articulating an exception to the open and obvious rule. It also ignores Arkansas Model Instruction 1104, civil. It also ignores standing precedent, Kuykendall, passed down or handed down in 1976, and Vanderveer handed down in 2003. Now, did those cases involve independent contractors? Your Honor, the Kuykendall case did not. It involved a delivery man, and Vanderveer, I believe it did. The man was hired to do some work at a, I think it was a landscaping company or something, but he had to descend a set of stairs, which was not the way that he would normally go. But let's assume, if my memory is inaccurate, that he was just an employee. Those cases, none of them cite that there is an exception that only applies if you're not an independent contractor. The law of Arkansas doesn't say that, and none of the Jackson cases say that either. So, at best, there might be a conflict in the way Arkansas's Supreme Court has articulated these rules, but that's a conflict that Arkansas's Supreme Court has set up to sort out. And regarding facts for a jury, there was a case handed down. It's cited at Woodley Petroleum v. Willis, 290 SW 953. 1927, Arkansas Supreme Court handled a case where a boss instructed a foreman to cross an oily beam. He slipped and fell and sued. He alleged that the job was rushed and he was obeying his boss's orders. That court ruled that whether one was forced or not to encounter the dangerous situation was one for a jury. And so I think that that also comes to bear directly on this case. I think, at the end of the day, Mr. Pinson's training, lack of it, whether it was trained inside a canopy or from a bucket truck, is something that a jury could argue about, but it's, as far as we are concerned, immaterial for these purposes. Those are belonging to the jury. My time is up, and I thank you very much for hearing us today. Thank you both. We'll go on then to the next case.